IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VIRGIL A. ARD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:20-cv-02525-K-BT |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Defendant United States of America filed a Motion for Summary Judgment (MSJ) in this medical malpractice case brought by *pro se* Plaintiff Virgil A. Ard following the death of his daughter Yvette Johnson. In this case, it is unclear whether Ard asserts a survival action or a wrongful death claim. Either way, as explained in these findings, conclusions, and recommendation, the District Court should GRANT United States' Motion for Summary Judgment (ECF No. 36) because (1) Ard lacks standing to bring a survival action on behalf of Johnson and the Court should DISMISS this claim without prejudice, and (2) Ard lacks expert testimony sufficient to create a genuine issue of material fact in support of his wrongful death claim and the Court should DISMISS this claim with prejudice.

**Background**

Ard brings this lawsuit under the Federal Tort Claims Act (FTCA). He alleges the medical providers at the United States Department of Veterans Affairs Medical

Center in Dallas (the "Dallas VA") negligently treated and neglected Johnson during a hospital stay that started on May 2 and ended in her death on June 14, 2014. *See* Compl. 4-6 (ECF No. 3). This mistreatment and neglect purportedly led to Johnson's death. *See id.* at 2-3; *see also* Pl.'s Mot. 2 (ECF No. 39). By this lawsuit, Ard seeks $750,000 in punitive damages. Compl.

Johnson had a medical history fraught with physical and mental health conditions. *See generally* MSJ App. (ECF No. 42). In 2010, she was diagnosed with systemic lupus eruthematosus (SLE) and Raynaud's phenomenon. *Id.* at 27, 43. In January 2013, she went to the emergency room twice for shortness of breath and increasing pain across her right side, and she was eventually admitted to the Dallas VA for ten days later that month to assess the underlying cause of these symptoms. *Id.* at 37-40. Her hospital records indicate Johnson suffered from SLE, lumbago, pain in her joints across multiple sites, rheumatoid arthritis, headaches, and osteoarthrosis. *Id.* at 41. In March 2014, she was again hospitalized at the Dallas VA for several days after a prescription drug overdose. *Id.*; *see id.* at 58. She also suffered from bipolar depression, suicidal behavior, moderate protein malnutrition, and alcohol abuse. *Id.* at 27-28, 41. In April 2014, she was on at least eight different medications for anxiety, depression, neuropathy, bladder problems, general pain, and alcohol abuse. *Id.* at 29. However, she failed to take her SLE and other mental-health medications for several months. *Id.*; *see id.* at 45, 59, 62.

On the night of April 26, 2014, the police arrested Johnson for public intoxication while lying in the street in an attempt to get hit by a car. *Id.* at 28, 402.

While in custody that night, she began screaming that she needed an ambulance. *Id.* at 6, 10. Paramedics were contacted. *Id.* When they arrived, she was nonresponsive. *Id.* at 6-7. The paramedics transported Johnson to Baylor Scott & White Medical Center at Grapevine ("Baylor Grapevine") for emergency medical treatment. *Id.*

Johnson was admitted to Baylor Grapevine's ICU for an alcohol overdose, major depression with suicidal ideation, and respiratory failure. *Id.* at 14. She was intubated because she was in acute respiratory failure. *Id.* at 12, 14. Baylor Grapevine determined Johnson's blood alcohol level was over ten times the legal limit. *Id.* at 24. She was extubated the following day but still under evaluation for potential deep venous thrombosis near the femoral catheter and for potential aspiration pneumonia. *Id.* at 20, 24.

During her stay at Baylor Grapevine, Johnson also had a peripherally inserted central catheter (PICC) line inserted to directly deliver her medications. *Id.* at 30, 42. A chest x-ray suggested she suffered from pulmonary edema or atelectasis. *Id.* at 22. An antinuclear antibody (ANA) test result was "very strongly positive" for SLE. *Id.* at 31. Johnson's primary doctor at Baylor Grapevine appeared to be concerned about her malnourishment as well. *Id.* at 42. At the time of her discharge, Johnson suffered from acute respiratory failure, pneumonitis due to inhalation of food or vomitus, malnutrition of moderate degree, acute venous embolism and thrombosis of deep vessels of proximal lower extremity, SLE, suicidal ideation, bipolar I disorder, complication due to other vascular

device/implant/graft, acute alcoholic intoxication, Raynaud's syndrome, a history of allergy to sulfonamides, and a low body mass index (BMI). *Id.* at 33.

On May 2, 2014, due to her psychiatric issues, Johnson made a choice to voluntarily admit herself to the Dallas VA for additional treatment or be subject to a court order for treatment at a local public hospital. *Id.* at 24. Accordingly, she was discharged from Baylor Grapevine and transported directly to the Dallas VA. *Id.* at 32.

Upon arrival at the Dallas VA, the medical staff reviewed her medical history and completed both full physical and mental health examinations. *Id.* at 43-55. Also, at the time, chest x-rays indicated Johnson's lungs were well-aerated and raised no concerns. *Id.* at 382-83. On May 3, 2014, after examining Johnson, a staff physician prescribed Vancomycin, an antibiotic, for a slight fever. *Id.* at 57. The staff physician noted Johnson was on multiple pain medications (including morphine). The staff physician also requested a mental-health evaluation and a rheumatology consult for Johnson's SLE. *Id.* at 56-58.

Later that day, Johnson was examined by a mental health resident physician. *Id.* at 58-61. Johnson confirmed how she arrived at Baylor Grapevine, and she admitted that she did not take her SLE and mental-health medications for several months, she was drinking more in the past few months, and she also was not eating for a while. *Id.* at 59. The resident and attending psychiatrist recommended Johnson be transferred to the psychiatry unit of the Dallas VA after she was stabilized. *Id.* at 61.

On May 4, 2014, Johnson was examined by a rheumatology fellow. *Id.* at 62-65. The fellow noted that Johnson had "intermittent fever spikes" since her admission to the Dallas VA, and that while she was on antibiotics, the source of the infection had not yet been identified. *Id.* Therefore, the fellow and the attending rheumatology staff physician ordered additional tests to determine if the issue was related to Johnson's alcohol withdrawal or a fungal source given her immunosuppression and recent treatment at Baylor Grapevine. *Id.* at 65, 67. Johnson was also restarted on Plaquenil, a brand of hydroxychloroquine for her SLE. *Id.* at 63, 67.

On May 5, 2014, Johnson was examined by another staff physician. *Id.* at 70-72. The physician determined Johnson's fever broke and noted additional testing to uncover the source of the fever, which pointed to a likely urinary tract infection (UTI). *Id.* The physician prescribed Zosyn, an antibiotic for the UTI. *Id.* The physician also diagnosed Johnson with asthenia and excessive debilitation likely related to her prolonged bed rest and poor nutrition. *Id.* at 72. Therefore, the physician ordered both physical and occupational therapy consults. *Id.* Also, on the same day, the rheumatology fellow reexamined Johnson to determine if additional medication was needed for her SLE and decided that no additional SLE treatment beyond the ongoing medication was needed since the cause of her infection was discovered and there was no evidence of a lupus flare. *Id.* at 73-74.

Over the next several weeks, Johnson received physical and occupational therapy treatments. *See id.* at 76, 86, 95, 106, 111-12, 125. She also continued to be

examined daily by staff physicians and hospitalists for her ongoing issues. *See id.* at 76-80, 86-88, 95-102, 104-05, 108-10, 112-132, 139-42. And she was monitored multiple times per day by the Dallas VA's nursing staff when the staff also provided medication, drew specimens for lab testing, assessed pain levels and skin integrity, and performed other necessary tasks. *See, e.g.*, *id.* at 80-85, 88-94, 99-100, 106-08, 110, 116, 121. Additionally, the Dallas VA provided a sitter in her room for one-on-one observation for a portion of time due to her prior suicidal ideation. *See, e.g.*, *id.* at 56, 75, 86.

During the next few weeks, Johnson complained of left lateral neck and shoulder pain. For the pain, she was prescribed Toradol on May 8, 2014, and Flexeril on May 9, 2014. *Id.* at 087, 96. A CT scan of Johnson's cervical spine showed pleural thickening in her left lung and "scattered ground glass opacities" in both lungs on May 9, 2014, related to her prior episode of acute respiratory failure. *Id.* at 381-82.

Johnson had a low-grade fever on May 16, 2014, so blood cultures were drawn. *Id.* at 118. The fever resolved without further intervention by May 18, 2014. *Id.* at 122, 127. It returned on May 20, 2014, so additional blood and fungal cultures were ordered to determine the fever's cause. *Id.* Johnson's fever spiked to 101.5 degrees on May 21, 2014. *Id.* at 131. But her lab tests were negative. *Id.* Therefore, two additional sets of blood cultures and urine tests, a chest x-ray, and rheumatology and infectious disease consults were ordered. *Id.* The chest x-ray performed that day indicated that Johnson might have early pneumonia. *Id.* at

380-81. Also that day, the rheumatology fellow and staff physician found no signs or symptoms of an SLE flare up, indicating that her lung infection was the likely source of her fever. *Id.* at 134-35.

Based on lab and imaging results, again that same day, an infectious-disease staff physician determined that Johnson likely had a viral respiratory illness, potentially pneumonia, or a new UTI. *Id.* at 133. The infection-disease physician recommended removal of the PICC line originally inserted at Baylor Grapevine. *Id.* Several doctors on the infectious-disease team examined Johnson on May 22, 2014. They diagnosed her with aspiration pneumonia, prescribed several antibiotics, and ordered sputum cultures. *Id.* at 136-38. But on May 23, 2014, Johnson became hypotensive with abnormally low blood pressure and was transferred to the Dallas VA's Medical Intensive Care Unit (MICU). *Id.* at 143-45.

When arriving at the MICU, Johnson had fever, chills, fatigue, a sore throat, painful swallowing or odynophagia, a productive cough with yellow sputum, difficulty breathing or dyspnea, and general muscle pain or myalgia. *Id.* at 146. The MICU resident and the pulmonary staff physician diagnosed Johnson with health-care-acquired pneumonia due to the length of her duration in the hospital, septic shock likely caused by the pneumonia, acute kidney injury, and acute chronic anemia. *Id.* at 150-52. Therefore, the proposed treatment plan included diuresis, obtaining additional cultures, continuing broad-spectrum antibiotics until all cultures were negative, and tapering steroids over a five-day period. *Id.* at 152. A central line was placed, and an echocardiogram was ordered. *Id.* at 150, 152-55,

385. The echocardiogram was performed that same day, and its results raised no concerns. *Id.* at 156-58.

On May 24, 2014, examining physicians noted Johnson was calm but complained of bilateral knee pain. *Id.* at 160-63. She was prescribed pain medication. *Id.* Otherwise, her condition improved significantly since her admission to the MICU. *Id.* Therefore, the physician determined she could transfer back to the regular floor. *Id.* at 161. On the morning of May 25, 2014, Johnson indicated she was feeling better. *Id.* at 168, 170. Other than the ongoing but improved pain in her knees, she had no other complaints. *Id.*

But Johnson's condition worsened over the next few hours, and by late afternoon, she had abnormally rapid breathing. *Id.* at 165, 168. The residents and attending physician placed Johnson on Bi-level Positive Airway Pressure (BiPAP) to help with her breathing and gave her several different medications, but Johnson's respiratory distress continued. *Id.* at 165. As a result, Johnson agreed to be intubated that evening. *Id.* at 164-65, 168. A CT scan of her chest that night appeared to demonstrate atypical pneumonia or pulmonary edema and possible atelectasis. *Id.* at 166, 373-75. A chest x-ray that same evening also indicated the possibility of pneumonia or aspiration pneumonia. *Id.* at 375-76. Therefore, Johnson was diagnosed with acute respiratory distress syndrome (ARDS) on May 26, 2014. *Id.* at 177.

Johnson's condition slowly worsened with an ongoing fever, occasional swings in blood pressure, and the repeated need to increase the pressures and

oxygen levels on the ventilator. *See id.* at 179, 181, 184-86, 189-91, 194-96, 198-203, 211-17, 223-30, 234-41, 243-50, 251-55, 257-60, 265-69, 273-77, 279-92, 299-304, 307-14. She was treated with Versed, Fentanyl, Nimbex, and broad-spectrum antibiotics for pneumonia and septic shock. *Id.* The doctors also continued to discuss Johnson's treatment and medical needs with her family and friends as appropriate. *See, e.g.*, *id.* 204-05, 207-10, 218-20, 221, 242.

Michelle Ferrell was Johnson's companion and emergency contact at the Dallas VA. *Id.* at 150, 152-55, 385. On May 31, 2014, Ferrell informed the primary MICU resident that she wanted to modify Johnson's resuscitation status. *Id.* at 231. She changed the status so that Johnson would be given medication and cardioversion to restart her heart and breathing if Johnson were to go into cardiopulmonary arrest, but she was not to be given mechanical compressions. *Id.* On June 6, 2014, Ferrell repeated this instruction to the staff physician treating Johnson, and a Do Not Resuscitate (DNR) order was entered. *Id.* at 270-72.

On June 11, 2014, Johnson experienced a cardiac arrest. *Id.* at 316-18. 339. A chemical resuscitation was successfully performed. *Id.* Based on Johnson's blood tests, it was determined that her arrest resulted from septic shock or metabolic acidosis. *Id.* at 339. And although Johnson was resuscitated, she was not responding to verbal or noxious stimuli and her pupils were non-responsive and unequal. *Id.* When the MICU resident and attending physician discussed Johnson's condition with her family, Ferrell informed them she wanted Johnson

changed back to full code, allowing for both chemical and mechanical resuscitation. *Id.* at 339-40, 346.

On June 12, 2014, Johnson was examined by an infectious disease resident. *Id.* at 336-38. The resident indicated that Johnson developed multiorgan failure after her cardiac arrest. *Id.* Therefore, both a nephrology and a neurology consult were completed to assess Johnson's condition. *Id.* at 325-34.

The nephrology fellow indicated that Johnson's kidney function had waxed and waned during hospitalization and that she likely had a multifactorial acute kidney infection. *Id.* at 326, 328-29. Before beginning dialysis, the fellow and nephrology staff physician recommended waiting for the neurology consult to determine whether Johnson would benefit from continuing medical treatment. *Id.* at 328-29.

Later that morning, the neurology resident indicated that Johnson was unresponsive to sternal rub and nail bed pressure, her pupils were unreactive, and she was comatose and without any brainstem reflexes. *Id.* at 333-34. However, since Johnson was severely acidotic which could interfere with her neurology exam, the resident recommended a second neurology exam 24 hours later. *Id.* at 334. Therefore, the next day on June 13, 2014, the same resident reexamined Johnson. Unlike the prior day, Johnson had a corneal reflex, and she was now overbreathing the ventilator. *Id.* Accordingly, the nephrology fellow also reexamined Johnson and determined she should receive supportive care for her kidney infection while she remained acidotic. *Id.* at 361-62.

Later that afternoon, the MICU resident and attending physician determined that an arterial line was necessary to accurately monitor Johnson's blood pressure. *Id.* at 351. Ferrell consented. *Id.* at 351-52. And the resident, under the supervision of the attending physician, attempted to place the arterial line. *Id.* But they were unsuccessful. *Id.* They failed to access Johnson's artery. *Id.* That night, Johnson became bradycardic and lost a pulse. *Id.* at 347. A code was called and both chest compressions and chemical resuscitation were performed. *Id.* Eventually, she regained her pulse. *Id.*

During compressions, copious amounts of bright red blood were suctioned from Johnson's endotracheal tube. *Id. at* 347-48. A chest x-ray indicated that the "patchy infiltrates" and "diffuse opacities" in Johnson's lungs had been getting progressively worse when compared to similar x-rays over the past few days, especially since the chest x-ray taken earlier that morning. *Id.* at 347, 366-72. Accordingly, Johnson was placed back on the ventilator. *Id.* at 347, 349.

Once on the ventilator, Johnson lost a pulse again. *Id.* And the doctors again performed CPR and chemical resuscitation on her. *Id.* The doctors remained concerned about Johnson's oxygenation. *Id.* More blood was suctioned from Johnson's endotracheal tube. *Id.* at 349. Johnson's pupils were fixed and dilated despite being resuscitated. *Id.* at 347. Johnson lost a pulse for a third time. *Id.* Doctors again performed CPR and chemical resuscitation. *Id.*

Throughout the evening, Johnson's doctors discussed the repeated episodes of Johnson losing her pulse with Ferrell and Hayisha Alexander, Johnson's

11

daughter. *Id.* at 347, 349-40, 365. The doctors explained that each time Johnson had to be resuscitated, significant amounts of blood appeared to be filling up Johnson's lungs and had to be suctioned out of the endotracheal tube; she was not oxygenating; her heart rate was slowing down; and her condition was rapidly deteriorating. *Id.* The doctors recommended that no additional heroic measures be taken. *Id.* at 347, 340, 365. The family agreed. *Id.*

Johnson was placed back on a ventilator. *Id.* at 347. About 30 minutes later, her heart stopped. *Id.* Johnson passed away at 11:36 p.m. on June 13, 2014. *Id.* at 347-48, 364-65.

Ard alleges that Dallas VA's medical staff negligently treated Johnson because she was neglected by the hospital staff as they were apparently busy with personal matters, she was used to train resident physicians without appropriate attending-physician supervision when she was admitted to the MICU, the medical staff failed to obtain proper consent to modify Johnson's resuscitation status, and she was overdosed on prescribed medications. Compl. 4. He further argues these negligent acts and omissions caused Johnson's death. He expressly asserts a medical malpractice and wrongful death claim. *Id.* However, it's unclear whether he asserts a medical malpractice survival action or a wrongful death claim based on medical malpractice. Therefore, the Court construes his pleadings to assert a survival action and a claim for wrongful death, both premised on medical malpractice.

The Court entered a pretrial scheduling order on April 9, 2021. Sched. Order (ECF No. 33). Among other pretrial matters, the scheduling order established deadlines for discovery and expert-witness designation. Sched. Order 1-2. Discovery was to be completed by October 18, 2021, and expert witnesses must have been designated by July 19, 2021, for parties with the burden of proof on a claim. *Id.*

Ard failed to comply with the Court's scheduling order and the related Federal Rules of Civil Procedure. He did not designate any expert witnesses. *See* MSJ Br. 32 (ECF No. 37); *see also* Fed. R. Civ. P. 26(a)(2)(A), (D). He did not provide the United States with an expert report or any other sufficient expert disclosures. *See id.*; *see also* Fed. R. Civ. P. 26(a)(2)(B)-(C). Ard failed to provide any evidence he is a beneficiary of Johnson's estate or the estate is free of creditors. *See* MSJ Br. 29. And the time for discovery has expired. Sched. Order 1.

On December 27, 2021, the United States filed its Motion for Summary Judgment (ECF No. 36) arguing Ard cannot prevail on his FTCA claims because he asks for relief not available under the FTCA, he does not have standing to bring a survival action, and he is unable to provide expert testimony necessary to create a genuine issue of material fact on his wrongful death claim as a result of his failure to comply with the Federal Rules of Civil Procedure and this Court's scheduling order. MSJ Br. 27-34. Ard responded, MSJ Resp. (ECF No. 45), and the United States replied, MSJ Reply (ECF No. 46). Accordingly, the Motion for Summary Judgment is ripe for determination.

## Legal Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue for trial. *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (citation omitted). The movant's burden can be satisfied by demonstrating that there is an absence of evidence to support the nonmoving party's case, which the nonmovant bears the burden of proving at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets its initial burden, the nonmovant must show that summary judgment is not proper. *Duckett v. City of Cedar Park*, 950 F.2d 272, 276 (5th Cir. 1992) (citation omitted). The parties may satisfy their respective burdens "by tendering depositions, affidavits, and other competent evidence." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992) (citing Fed. R. Civ. P. 56(e); *Int'l Shortstop, Inc. v. Rally's*, 939 F.2d 1257, 1263 (5th Cir. 1991)).

The party opposing the summary judgment motion must identify specific evidence in the record and state the precise manner in which that evidence supports the party's claim. *Esquivel v. McCarthy*, 2016 WL 6093327, at *2 (N.D. Tex. Oct. 18, 2016) (Lindsay, J.) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1988)). "Rule 56 does not impose a duty on the court to 'sift through the record in search of evidence' to support the nonmovant's opposition to the motion for summary judgment." *Esquivel*, 2016 WL 6093327, at *2 (citing

*Ragas*, 136 F.3d at 458; *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)). All evidence must be viewed in the light most favorable to the party opposing the summary judgment motion. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993) (citing *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986)).

Although the courts construe *pro se* litigants' pleadings liberally, *pro se* parties are not exempt from complying with the relevant rules of procedural and substantive law. *U.S. Bank, N.A. v. Richardson*, 2018 WL 5722680, at *3 (N.D. Tex. July 30, 2018) (Rutherford, J.) (citing *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981) ("The right of self-representation does not exempt a party from compliance with relevant rules of procedural and substantive law . . . . Rather, such a litigant acquiesces in and subjects himself to the established rules of practice and procedure.") (citations omitted)).

### Analysis

The United States is entitled to summary judgment because Ard asks for relief that is not available under the FTCA and he cannot create a genuine issue of material fact in support of his FTCA claims.

Under the FTCA, Congress waived the United States' sovereign immunity for claims arising from certain torts committed by federal employees. *See* 28 U.S.C. §§ 1346(b)(1), 2671-80; s*ee also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217-18 (2008). Specifically, the FTCA gives federal courts jurisdiction over claims against the United States for money damages "for injury . . . or personal injury . . .

caused by the negligent or wrongful act . . . any employee of the [United States] while acting within the scope of h[er] office or employment, under circumstances where the United States, if a private person, would be liable to the [plaintiff] in accordance with the law of the place *where the act . . . occurred*." *Sheridan v. United States*, 487 U.S. 392, 398 (1988) (emphasis added) (quoting 28 U.S.C. § 1346(b)).

Here, Ard alleges Johnson died as a result of the Dallas VA's medical malpractice. In other words, Ard alleges United States' employees acted negligently while acting in the scope of their employment under circumstances where the United States may be liable if the United States were a private person. Accordingly, the United States waived its sovereign immunity under the FTCA for Ard's claims. Accordingly, Ard may sue under the FTCA for claims based on the Dallas VA's medical malpractice.

1. Ard's requested relief is unavailable under the FTCA.

While the United States shall be liable for any tort claims in the same manner as a private individual, it "shall not be liable . . . for punitive damages." 28 U.S.C. § 2674. Punitive damages are thus "statutorily prohibited" in an FTCA action. *Carlson v. Green*, 446 U.S. 14, 22 (1980); *see Molzof v. United States*, 502 U.S. 301, 312 (1992).

Here, Ard does not plead a requested amount for any economic or noneconomic damages. *See* Compl. 5 (ECF No. 3). Instead, he only asks for "[p]unitive damages at $750[,]000 because the [Dallas] VA did a willful wrongful

16

act and refused to admit their mistakes and willfully lied about [Johnson's] death." *Id.* Therefore, Ard's request for punitive damages—the only requested damage amount—must be dismissed under the FTCA. *See Bishop v. United States*, 2021 WL 356841, at *6 (N.D. Tex. Jan. 13, 2021) (Reno, J.) ("[T]o any extent Plaintiff is seeking actual punitive damages, he cannot recover such damages under the FTCA."), *rec. adopted*, 2021 WL 351408 (N.D. Tex. Feb. 2, 2021) (Kacsmaryk, J.). Accordingly, the United States is entitled to summary judgment as to Ard's claims for punitive damages—his only claim for an amount of damages.

2.  Ard cannot create a genuine issue of material fact to support his FTCA claims.

To determine the substantive legal rules applicable to an FTCA plaintiff's claim, state law applies since the United States is to be held liable for allegedly tortious conduct "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see Edwards v. United States*, 519 F.2d 1137, 1139 (5th Cir. 1975) ("State law controls the issue of liability under the [FTCA]."). Ard complains of alleged negligence occurring at the Dallas VA in Texas. Therefore, Texas law applies. *See Ayers v. United States*, 750 F.2d 449, 452 n.1 (5th Cir. 1985).

Here, Ard pursues both a medical malpractice survival action and wrongful death claim. Texas law distinguishes between survival and wrongful death claims.

a.  *Ard lacks standing to bring a survival action.*

Under Texas state law, a cause of action for personal injury does not abate when the injured person dies. Tex. Civ. Prac. & Rem. Code § 71.021(a). Instead, it

"survives to and in favor of the heirs, legal representatives, and estate of the injured person." *Id.* § 71.021(b). A survival action "preserves a claim for the estate rather than creating a new cause of action for those surviving the decedent." *Pluet v. Frasier*, 355 F.3d 381, 384 (5th Cir. 2004); *see also Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 850 (Tex. 2005). Hence, the only recoverable damages are those which the decedent herself sustained while alive, and not any damages claimed independently by the survival action plaintiffs. *Russell v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 345 (Tex. 1992); *see also Diaz v. Westphal*, 941 S.W.2d 96, 98 (Tex. 1997) (explaining that a survival action under section § 71.021 allows a "decedent's heirs, legal representatives, and estate to bring suit for personal injuries decedent suffered before death").

A survival claim is brought by a decedent's estate; therefore, only certain individuals have the capacity to bring such a claim on the estate's behalf. *See Rodgers v. Lancaster Police & Fire Dep't*, 819 F.3d 205, 209-10 (5th Cir. 2016). Generally, the personal representative of the estate is the only person who has capacity to bring a claim on behalf of the estate. *See Frazier v. Wynn*, 472 S.W.2d 750, 752 (Tex. 1971). A personal representative can be the estate's executor, the estate's administrator, or a successor to either the estate's executor or estate's administrator. Tex. Est. Code § 22.031(a). However, an heir at law can also bring a survival action on behalf of the estate if they can allege and prove that there is no administration pending and none is necessary. *See Frazier*, 472 S.W.2d at 752. If an individual dies intestate and does not have a spouse, the estate passes to the

decedent's children and those children's descendants, making these children the decedent's legal heirs. Tex. Est. Code § 201.001(b).

Here, to the extent Ard is asserting a survival claim, he has failed to demonstrate that he is legally entitled to bring such a claim on behalf of Johnson's estate. Ard has not demonstrated that he fits any of the categories of individuals allowed to bring a survival action. Ard failed to indicate he has been named as a personal representative of Johnson's estate. Ard failed to indicate that he is Johnson's legal heir.[1] Also, Ard failed to show whether Johnson had a will at the time of her death. But if she died intestate, Johnson's daughter would likely be deemed her legal heirs (in addition to any other children or grandchildren Johnson may have had). And even if Ard was named a legal heir to Johnson via a will, he has not alleged or shown Johnson's estate lacks pending administration or that none is necessary.

Additionally, only an individual licensed to practice law may represent the legal interests of another entity. *See, e.g., Weber v. Garza*, 570 F.2d 511, 514 (5th Cir. 1978). However, "[a] person with capacity under state law to represent an estate in a survival action may proceed *pro se* if that person is the only beneficiary and the estate has no creditors." *Rodgers*, 819 F.3d at 211. Here, Ard failed to indicate he is an attorney licensed to practice law in Texas. Also, as the Court explained, Ard failed to show he is a beneficiary of Johnson's estate, much less the

---

[1] Ard is unlikely to be a legal heir since Johnson had a daughter and may have had other children or grandchildren.

sole beneficiary, given that Texas law indicates Johnson's daughter (and any additional offspring) are likely to be heirs. Ard also failed to demonstrate that Johnson's estate has no creditors. Therefore, Ard cannot proceed *pro se* with a survival action. Accordingly, the United States is entitled to summary judgment as to Ard's medical malpractice survival action—to the extent he is pursuing such a claim—and this claim should be dismissed without prejudice.

> ### b. *Ard has failed to come forward with necessary expert testimony in support of his wrongful death claim.*

Under Texas law, a surviving spouse, children, and parents of the deceased can bring a separate action for recovery of damages caused by an individual's wrongful death. Tex. Civ. Prac. & Rem. Code § 71.004(a); *Brown v. Edwards Transfer Co., Inc.*, 764 S.W.2d 220, 223 (Tex. 1988) (explaining that wrongful death benefits attach to those persons identified in the statute, as "wrongful death benefits do not belong to the decedent's estate"). A permitted party may bring a claim "if the individual injured would have been entitled to bring an action for the injury if the individual had lived." Tex. Civ. Prac. & Rem. Code § 71.003(a). Thus, the right to bring a wrongful death action is "entirely derivative of the decedent's right to have sued for his own injuries immediately prior to his death and is subject to the same defenses to which the decedent's action would have been subject." *Russell*, 841 S.W.2d at 347.

Here, Ard is Johnson's father. Therefore, Ard is entitled to bring a wrongful death claim based on medical malpractice subject to the same defenses that

Johnson's medical malpractice action would have been subject to prior to her death.

Under Texas law, when a plaintiff alleges wrongful death caused by medical malpractice, the plaintiff "bears the burden of proving (1) a duty by the . . . hospital to act according to an applicable standard of care; (2) a breach of that standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury." *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003). The plaintiff must establish the standard of care as a threshold issue before a court may consider whether the defendant breached that standard. *Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008). Additionally, the plaintiff must establish a causal connection between the defendant's actions and the individual's injury "beyond the point of conjecture; proof of mere possibilities will not [suffice]." *Wackman v. Rubsamen*, 602 F.3d 391, 400 (5th Cir. 2010).

Unless the mode or form of treatment is a matter of common knowledge or is within the experience of a layperson, expert testimony is required to prove the applicable standard of care as well as its breach. *See Hannah*, 523 F.3d at 601–02; *see also Quijano*, 325 F.3d at 567. Expert testimony is also required to show that the breach proximately caused the harm suffered. *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005). A plaintiff must also rule out other plausible causes of the injury. *Wackman*, 602 F.3d at 400.

Subject to the narrow exception for matters of common knowledge, a plaintiff must produce expert testimony to meet his burden of proof on a

malpractice claim. *Hannah*, 523 F.3d at 601; *see also Prindle v. United States*, 2011 WL 1869795, at *1-2 (N.D. Tex. May 13, 2011); *Woods v. United States*, 2010 WL 809601, at *3 (N.D. Tex. Mar. 8, 2010). Indeed, Texas law only excuses the requirement for expert testimony in cases of truly rare, obvious forms of negligence. *See, e.g.*, *Haddock v. Arnspiger*, 793 S.W.2d 948, 951 (Tex. 1990) (explaining that a plaintiff is excused from the requirement of expert testimony when the negligence was commonly understood, examples include improper use of mechanical instruments, operating on the wrong portion of the body, or leaving surgical instruments or sponges within the body).

In this lawsuit, Ard has not identified any rare, obvious forms of negligence that would excuse him from the requirement to prove his claim with expert testimony. Accordingly, Ard must produce medical-expert testimony to establish the applicable standard of care, as well as to create a genuine fact issue that the Dallas VA breached the standard of care, that Johnson was injured, and that the breach caused Johnson's injury. But Ard has not come forward with medical-expert testimony to establish any of the essential elements of his medical malpractice wrongful death claim.

Without medical-expert testimony, Ard cannot meet his burden to create a genuine issue of material fact that the Dallas VA committed malpractice or caused Johnson's death. Accordingly, the United States is entitled to summary judgment on Ard's wrongful death claim, and this claim should be dismissed with prejudice.

Furthermore, to the extent Ard requests the Court voluntarily dismiss his claims without prejudice, his request should be denied. Ard's response to the United States' Motion for Summary Judgment is titled "Plaintiff's Response to Judge's November 19, 2021 Order with Motion for a Dismissal Without Prejudice." MSJ Resp. 1. The November 19, 2021 Order set a briefing schedule for Ard to respond to the United States' Motion for Summary Judgment. *See* Order (ECF No. 41). Hence, the Court construed Ard's filing as his response to the United States' Motion.

In his response, Ard also requests the Court dismiss this action without prejudice because "this case was prejudiced from the start." MSJ Resp. 1. Specifically, Ard complains this case should be dismissed without prejudice because he did not consent to proceed before a magistrate judge, was denied appointed counsel, and Johnson's medical records were filed on the docket under seal against his wishes. *Id.* at 1-2. Ard "request[s] Judge Kinkeade look into" his case and "intercede." *Id.* at 3. Judge Kinkeade is the District Judge assigned to this action. Thus, it is not entirely clear whether Ard wants to voluntarily dismiss his case or merely have Judge Kinkeade vacate the referral to the undersigned magistrate judge.

To the extent Ard asks the Court to dismiss this case without prejudice, the Court should deny such relief. A plaintiff may voluntarily dismiss an action without a court order "before the opposing party serves a motion for summary judgment" or if all parties agree. Fed. R. Civ. P. 41(a)(1). Otherwise, "an action may be

dismissed at the plaintiff's request only by court order, on terms that the court considers proper." *Id.* at 41(a)(2). Here, Ard asked to voluntarily dismiss this action after the United States filed its Motion for Summary Judgment, and the United States opposes his request. *See* MSJ Reply 1 n.1.

Ard apparently seeks dismissal without prejudice because he is dissatisfied with the adverse rulings that he received from the undersigned magistrate judge. But adverse rulings, without more, are not unfair prejudice and do not provide a basis for judicial disqualification. *See Mandawala v. Northeast Baptist Hosp.*, 16 F.4th 1144, 1156-57 (5th Cir. 2021) ("[A]dverse rulings, without more, do not warrant disqualification" of a judge "for bias."); *see also Campbell Harrison & Dagley LLP v. Hill*, 2015 WL 7294880, at *6 (N.D. Tex. Nov. 19, 2015) (Lindsay, J.) ("To the extent [the defendant] challenges the Magistrate Judge's adverse rulings and suggests that they show bias, judicial rulings may be 'proper grounds for appeal, not for recusal.'" (quoting *Adrade v. Chojnacki*, 338 F.3d 448, 455 (5th Cir. 2003))).

In this case, Ard has not shown anything more than adverse rulings within his request for a court order of dismissal without prejudice. And at this stage of the proceedings—after almost two years of litigation, discovery, and multiple dispositive motions, including a summary judgment—the United States would be greatly prejudiced by having to relitigate Ard's wrongful death claim if it is dismissed without prejudice. Accordingly, the Court should deny Ard's opposed request for voluntary dismissal to the extent his response asks for this relief.

## Recommendation

The District Court should GRANT the United States' Motion for Summary Judgment (ECF No. 36), DISMISS Ard's survival action without prejudice, and DISMISS his wrongful death claim with prejudice.

**SO RECOMMENDED.**

June 8, 2022.

REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).